# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. JOHN J. CARSON, JR., | ) | |
| 2. MARVIN G. SMITH, | ) | |
| 3. ROOSEVELT SIMPKINS, and | ) | |
| 4. DEMONZE D. MAXWELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIV-18- 307-SLP |
| | ) | |
| 1. METRO READY-MIX, INC., and | ) | |
| 2. ERIC OWENS, individually, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | **ATTORNEY LIEN CLAIMED** |

## COMPLAINT

**COME NOW** the Plaintiffs, John J. Carson, Jr., Marvin G. Smith, Roosevelt Simpkins, and Demonze D. Maxwell, and for their Complaint in the above-entitled action, allege and state as follows:

## PARTIES

1. The Plaintiff's are:

   a. John J. Carson, Jr., an adult male resident of Oklahoma County, Oklahoma;

   b. Marvin G. Smith, an adult male resident of Canadian County, Oklahoma;

   c. Roosevelt Simpkins, an adult male resident of Oklahoma County, Oklahoma; and

-1-

   d.  Demonze D. Maxwell, an adult male resident of Oklahoma County, Oklahoma.

  2.  Defendants are:

   a.  Metro Ready-Mix, Inc. ("Metro Ready Mix"), an entity doing business in and around Oklahoma County, Oklahoma; and

   b.  Eric Owens, an individual, who at all relevant times hereto owned and operated Defendant Metro Ready-Mix.

## JURISDICTION AND VENUE

  3.  This is a cause of action arising out of Plaintiffs' former employment with Defendant Metro Ready-Mix. Plaintiffs collectively assert causes of action for race discrimination, racial harassment, the creation of a racially hostile work environment and retaliation in violation of 42 U.S.C. §1981. Additionally, Plaintiffs Carson, Simpkins and Smith assert claims for race discrimination, racial harassment, the creation of a racially hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e, *et seq.*). Plaintiffs Carson, Simpkins and Smith also assert a cause of action for wrongful discharge in violation of state law which prohibits terminating employees for engaging in whistle-blowing activities (i.e., a *Burk* tort).

  4.  Jurisdiction over Plaintiffs' federal causes of action is vested in this Court under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiffs Carson's, Simpkins' and Smith's corresponding state law claim as it arises out of the same core of

operative facts as the federal claims and jurisdiction over it is vested in this Court under 28 U.S.C. § 1367(a).

5. To the extent required, Plaintiffs have exhausted their administrative remedies as to the above-listed claims by timely filing Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Dismissals and Notice of Rights letters to Plaintiffs Carson, Smith and Simpkins, dated January 18, 2018, which they received by mail thereafter. Plaintiffs Carson, Smith and Simpkins have timely filed this action within ninety (90) days of receipt of their notices of rights to sue.

6. Defendants are located in Oklahoma County and all acts complained of occurred in or around Oklahoma County. Oklahoma County is located within the Western District of the United States District Court of Oklahoma. Thus, venue is proper in this Court under 28 U.S.C. § 1391(b).

## GENERAL STATEMENT OF FACTS

7. Metro Ready-Mix is a concrete business which batches, transports, supplies and pours concrete for commercial, industrial and residential customers in and around the Oklahoma City metro area. Eric Owens (who is White) owns and operates Metro Ready-Mix.

8. Each of the Plaintiffs named herein (who are Black) were employed with Metro Ready-Mix as Drivers.

9. Plaintiff Carson was hired on or about June 7, 2014, and continued his

employment until in or around March 2017.

10. Plaintiff Simpkins began his employment in or around September 2014, and continued working for Metro Ready-Mix until in or around September 2016.

11. Plaintiff Maxwell was employed with Metro Ready-Mix from in or June 2014 through in or around June 2015.

12. And, Plaintiff Smith worked for Metro Ready-Mix from in or around August 2016 through in or around October 2016.

13. Throughout their employment with Metro Ready-Mix, Plaintiffs were discriminated against and harassed based on their race and retaliated against based on their complaints of unlawful activity, including *inter alia* race discrimination and harassment within the workplace.

14. Particularly, offensive and unwelcome racially derogatory comments were used on a consistent basis by co-workers and management-level employees of Metro Ready-Mix, including but not limited to Owens. Said comments included *inter alia* use of the terms "n*gger," "f***ing n*gger," "lazy n*gger," "lying n*gger" and "boy."

15. In addition, Plaintiffs were treated less favorably than their White counterparts with respect to their work schedules, work hours, work assignment and pay. Plaintiffs were also subject to more stringent work standards and written up for alleged policy violations that White employees got away with. And, Plaintiffs were retaliated against when they complained that they were being harassed and discriminated against based on their race.

16. More particularly, throughout their employment, White drivers were given preference with respect to work hours. Before weekends and holidays, White drivers often asked to work additional hours to earn more money. When this occurred, Plaintiffs' hours were cut, while the White drivers were allowed to work overtime. Yet, when White drivers did not want additional hours, Plaintiffs were forced to work beyond their scheduled shifts (often beyond the hours-of-service limitations imposed by Department of Transportation safety regulations), while the White drivers were allowed to leave.

17. Plaintiffs complained to the Plant Managers (who were White) that they were being instructed to work in violation of the hours-of-service limitations. Plaintiffs explained they were fatigued due to the extensive hours they were forced to work and concerned for the safety of themselves and others. Plaintiffs also complained that their White counterparts were not required to work such excessive hours. Yet, the Plant Managers threatened to fire Plaintiffs if they did not work the hours they were assigned.

18. Plaintiffs were also repeatedly required to take customer call-back deliveries at the end of their shifts, rather than White drivers being instructed to make such deliveries. That is, toward the end of the day, customers often called for additional concrete, beyond that which they originally ordered. White drivers would be available at Defendant's plant to make such deliveries. However, the White drivers were consistently permitted to clean their trucks (referred to as "rocking out") and clock out for the day, while Plaintiffs were required to work beyond their scheduled shifts to make the call-back deliveries.

19. Plaintiffs were also repeatedly required to work weekends; whereas, their White counterparts were allowed weekends off. White employees were also readily allowed to take days off or leave work early upon request. Yet, Plaintiffs' leave requests were denied or met with resistence.

20. A significant or motivating factor in the unlawful acts described herein was an intention to harass and discriminate against Plaintiffs because of their race and in retaliation for their complaints of unlawful race-based conduct as more fully described herein.

21. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered injuries described hereafter.

### Plaintiff John J. Carson, Jr.

22. Throughout his employment, Plaintiff Carson satisfactorily performed his job.

23. Despite his satisfactory work performance, Plaintiff Carson was terminated in or around March 2017.

24. Owens claimed the reason for termination was that Plaintiff Carson failed to show up for work. However, the stated basis for his termination is pretext.

25. Plaintiff Carson did not fail to show up for work as accused. And, he was fired just months after he filed a Charge of Discrimination with the EEOC based on race discrimination, harassment and retaliation.

26. In addition to the unlawful treatment described above, Plaintiff Carson was written up for alleged policy infractions, such as, clocking in a few minutes late. Yet, White

employees were not similarly disciplined if they were late. And, a number of White drivers committed more serious policy violations, including but not limited to engaging in physical altercations with co-workers, sending nude photographs to female employees and damaging company property, yet they were not disciplined.

27. Plaintiff Carson's leave requests were also repeatedly met with resistance. For example, in or around July 2015, after completing his work for the day, Plaintiff Carson asked General Manager Chris Martin if he could clock out early to attend to a personal matter. However, Owens, who overheard Plaintiff Carson's request, interceded, yelling "let his ass go," referring to Carson. Owens further shouted, "find someone else if he don't want to stay and work." Carson asked why Owens was verbally attacking him, whereupon Owens began repeatedly calling Carson "boy," and threatening to fight Carson.

28. On another occasion, in or around April 2016, Plaintiff Carson sent a text message to Plant Manager Jamie (Last Name Unknown), who is White, requesting off the following morning because his house flooded. Plaintiff Carson sent pictures of his damaged home. Yet, Jamie questioned whether Carson was being honest about his need for leave.

29. Further, in or around September/October 2016, Jamie forced Plaintiffs Carson and Smith to exchange shifts. Plaintiff Carson was forced from days to nights. And, Plaintiff Smith from nights to days. This was so despite the fact White employees were allowed input on the shifts they worked. And, Plaintiff Carson had expressed preference for working days, while Plaintiff Smith preferred working nights.

30. Jamie and other management-level staff, including but not limited to Owens and Plant Manager Eddie Martin (Chris Martin's brother), who is White, also repeatedly cursed at Plaintiff Carson and treated him in a degrading fashion. Yet, they did not treat White employees in this manner.

31. By way of example, in or around May 2015, Eddie Martin demanded Plaintiff Carson drive a truck that was normally assigned to Plaintiff Maxwell. The truck did not have air conditioning. Thus, Plaintiff Carson told Eddie Martin that he would drive the truck in the mornings, but was unable to drive the truck in the afternoons due to the heat. Eddie Martin threateningly responded, "I got your number," and said "there's more than one way to skin a cat."

32. Thereafter, in or around July 2015, Owens cursed at Plaintiff Carson during an employee meeting. During the meeting, discussion was had about the fact that employees were requesting pay raises and health insurance. Owens, looking at Plaintiff Carson, repeatedly stated "someone" complained to Martin that employees were not receiving raises or insurance, while his (Owens') wife had a new car. In response, Plaintiff Carson stated he talked to Martin. However, before Plaintiff Carson could explain he did not complain about Owens' wife having a new car, Owen's cut Plaintiff Carson off, stating "don't worry about what kind of f***ing car we have."

33. Additionally, in or around August 2015, Owens directed Plaintiff Carson to drink from a contaminated water hose when Plaintiff Carson asked for some drinking water

due to the heat. Yet, Owens gave White drivers drinking water, soda and snacks.

34. Owens also repeatedly cursed at Plaintiff Carson over the CB radio (which could be overheard by other employees), saying Plaintiff Carson "didn't give a f***" when Plaintiff Carson inadvertently delivered more concrete than was needed to a job.

35. Owens also readily gave pay advances to White employees. Yet, in or around December 2015, when Plaintiff Carson requested a pay advance, Owens hatefully responded, "I'm not a f***ing bank."

36. Further, in or around September 2016, one of Plaintiff Carson's co-workers, Chris (Last Name Unknown), who is White, said that Owens told Martin, who is White that he (Owens) could not believe that "f***ing n*gger," referring to Plaintiff Carson, "didn't take the [health] insurance" after it was offered. According to Chris, Owens further said "that f***ing n*gger was the main one asking for it."

37. Thereafter, in or around October 2016, one of Plaintiff Carson's co-workers, Adolfo (Last Name Unknown), who is Hispanic, approached Plaintiff Carson crying, stating he (Adolfo) "couldn't take anymore," that he overheard Jamie and two other White employees, Tim Rose and Chris, in the office calling Plaintiff Carson and other Black staff "n*ggers," "lazy son-of-a-b*tches" and "lying n*ggers." Adolfo told Plaintiff Carson this was not a one time incident, that Jamie and other White employees often make such racist remarks. And, Plaintiff Carson had frequently overheard Jamie refer to Adolfo as a "wet back" and "lazy Mexican."

38. Based on the foregoing, Plaintiff called Martin shortly after speaking with Adolfo, telling Martin that the racist comments had to stop. Yet, Martin failed to take any remedial action. Thus, Plaintiff Carson went to Owens.

39. Plaintiff Carson told Owens about the racist comments being made. He also informed Owens that he was told Owens referred to him (Plaintiff Carson) as a "f***ing n*gger." Yet, Owens simply responded, "you can't believe everything you hear," failing to deny the racist comment attributed to him.

40. Plaintiff Carson pleaded with Owens to fix the problem and make the comments stop. Carson told Owens that unless things changed, he was concerned Metro Ready-Mix would be sued. Yet, Owens callously responded, "I don't care. I have insurance."

41. With no remedial action being taken, Plaintiff Carson filed a Charge of Discrimination with the EEOC on or about October 31, 2016.

42. Plaintiff Carson's hours were significantly cut thereafter. Jamie often told him no work was available. Yet, when Plaintiff Carson drove by the plant on those occasions when he was told there was no work, he saw work was, in fact, being performed.

43. After several months, Owens called Plaintiff Carson in or around early- 2017, claiming he would "fix the problem." Owens asked Plaintiff Carson to call Plaintiffs Smith, Simpkins and Maxwell (all separated from employment at that time) and tell them they could have their jobs back. As such, Plaintiff Carson did as Owens asked.

44. Owens told Plaintiff Carson (who had been offered a job elsewhere), not to leave his employment with Metro Ready Mix. Owens also told Plaintiffs Smith and Maxwell they could have their jobs back, and said Plaintiff Simpkins could come back too. Before allowing them to return, however, Owens told Plaintiffs Carson, Smith and Maxwell that he needed "a favor," for them to call the EEOC and "call the case off."

45. Per Owens' request, Plaintiffs Carson, Smith and Maxwell (together), along with Owens, initiated a three (3) way call to the EEOC. When the phone was answered by the EEOC, Owens hung up. As such, Plaintiffs Carson, Smith and Maxwell also hung up (after Owens). And, they did not withdraw their claims.

46. Thereafter, despite his promise to the contrary, Owens failed to hire back Smith, Maxwell and Simpkins. And, he fired Plaintiff Carson shortly thereafter in or around March 2017.

**Plaintiff Marvin G. Smith**

47. From the outset of Plaintiff Smith's employment (in or around August 2016), Plaintiff Smith was treated unfavorably. On the first pay day after he began working, Plaintiff Smith was not paid.

48. He was told he did not have any work hours. Yet, he had turned in a time sheet. And, another employee verified Plaintiff Smith did, in fact, work. Plaintiff Smith was then chastised and called a "screw up" for allegedly not keeping up with his time.

49. Plaintiff Smith was also assigned to drive a truck with mechanical defects,

while a White driver (hired after Plaintiff Smith) was assigned a newer truck without defects. The truck Plaintiff Smith was assigned was uncontrollable and wandered all over the road. Plaintiff Smith complained to Martin and Jamie that the truck was dangerous and that the White driver was being treated more favorably. Yet, Martin and Jamie said Plaintiff Smith would have to get used to it or find another job.

50. By comparison, however, one day a White driver briefly drove the truck that Plaintiff Smith had been assigned. The White driver, like Plaintiff Smith, complained there was something wrong with the truck, that the truck was dangerous. Unlike Plaintiff Smith, however, the White driver was told to park the truck. And, the next day, Plaintiff Smith was forced to resume driving the truck.

51. Plaintiff Smith was also subjected to repeated racist remarks. By way of example, Plaintiff Smith saw the name "Pookie" written on a whiteboard listing drivers' names and truck assignments. Plaintiff Smith asked who is "Pookie," to which the White drivers laughed and responded that Plaintiff Smith was, that he looked like the character "Pookie" (a crack addict) that Chris Rock played in the movie *New Jack City*.

52. On another occasion, Plaintiff Smith's co-worker, Chris, who is White, commented that actor Denzel Washington would be a "bad boy" if he were White. Chris further stated that Denzel Washington was "okay, but if he were White, he would be the sh*t." Jamie and another White employee, who were present, agreed with Chris.

53. Additionally, Plaintiff Smith frequently overheard Jamie refer to Hispanic

driver Adolfo as a "f***ing wetback" and comment that Adolfo should "go back to Mexico."

54. Ultimately, the conditions to which Plaintiff Smith was subjected were so intolerable that Plaintiff Smith was forced to leave his employment and constructively discharged in or around October 2016. Plaintiff Smith sent Martin and Jamie text messages on or about October 19, 2016, stating he was resigning because he could no longer withstand the favoritism and racist comments. Yet, no remedial action was taken. Rather, Martin simply responded to Plaintiff Smith's text, stating: "Ok good luck to you."

55. At or around this same time (i.e., in or around October 2016), Plaintiff Smith filed a Charge of Discrimination with the EEOC. And, although Owens told Plaintiff Smith in or around early-2017 that he would "fix the problem" and rehire Plaintiff Smith if Plaintiff Smith would "drop the case," Owens failed to rehire Smith when Smith proceeded his EEOC charge.

**Plaintiff Roosevelt Simpkins**

56. Throughout his employment, Plaintiff Simpkins was given less favorable work schedules, work assignments and work hours than his White counterparts (as set out above).

57. Moreover, in or around late-2015/early-2016, acting Plant Manager Eric Ackromis, who is White, allowed White drivers to take breaks when there were no deliveries to be made. Yet, he repeatedly told Plaintiff Simpkins, "I've got a shovel with your name on it," ordering Plaintiff Simpkins to shovel gravel at the plant while his White counterparts were allowed to rest.

58. Ultimately, the conditions to which Plaintiff Simpkins was subjected were so intolerable that he was forced to leave his employment and was constructively discharged in or around September 2016.

59. Thereafter, Martin sent Plaintiff Simpkins multiple texts, chastising Plaintiff Simpkins for having resigned. In response, Plaintiff Simpkins told Martin that he could no longer withstand the discrimination he was forced to endure. Yet, no remedial action was taken.

60. Although Owens said in or around early-2017 that he would "fix the problem" and rehire Plaintiff Simpkins, when Plaintiff Simpkins proceeded with his right to pursue his EEOC Charge, he was not rehired.

**Plaintiff Demonze D. Maxwell**

61. Throughout his employment, Plaintiff Maxwell satisfactorily performed his job.

62. Despite his satisfactory work performance, Owens terminated Plaintiff Maxwell without reason in or around June 2015.

63. The month before Plaintiff Maxwell was terminated (i.e., in or around May 2015), he requested a $300.00 pay advance to cover the cost of a tooth extraction he was required to undergo. Days later, Plaintiff Maxwell began experiencing severe chest pains and difficulty breathing. As such, he was admitted to the hospital, whereupon, he was diagnosed with pneumonia and deep vein thrombosis (DVT).

64. As a result of his medical condition, Plaintiff Maxwell was required to be

hospitalized for five (5) days. He was then placed on light duty restrictions upon his release.

65. Plaintiff Maxwell provided Owens with a physician's note, reflecting that he was required to work light duty. However, Owens refused to allow Plaintiff Maxwell to return to work.

66. Owens stated that light duty was not available. Yet, Owens permitted White drivers to work light duty, including but not limited to, Tim Rose.

67. Upon receiving a full work release, Plaintiff Maxwell again sought to return to work. However, Owens said Plaintiff Maxwell could not return until Plaintiff Maxwell paid back the $300.00 pay advance he received weeks before. This was so despite the fact that Owens did not make similar demands that White employees immediately pay off their advances, but rather allowed the White employees to pay their advances back over a period of time, with small increments being deducted from their paychecks.

68. Plaintiff Maxwell asked Owens if he could pay the advance from his next paycheck (after returning to work). Yet, Owens refused, terminating Plaintiff Maxwell's employment.

69. Moreover, prior to being fired, Plaintiff Maxwell experienced racial harassment and discrimination, in that, he was given less favorable work schedules, assignments and hours than his White counterparts (as set out above). Plaintiff Maxwell was also assigned to drive a truck with multiple mechanical defects, while White drivers were assigned to drive newer trucks without defects.

70. The air conditioning in the truck that Plaintiff Maxwell was assigned was broken, leaving Plaintiff Maxwell to work in the heat during the summer. The backup lights were also broken and the steering pulled to the left and right, causing the truck to swerve. Plaintiff Maxwell complained that the truck was dangerous. Yet, he was forced to continue operating the truck during the majority of his employment.

71. Plaintiff Maxwell was also subjected to degrading comments by Owens. For example, on multiple occasions, dispatchers (who were White) would give Plaintiff Maxwell the wrong directions to a job site. Owens would then yell at Plaintiff Maxwell over the CB radio (which could be overheard by other employees), "do you know where the hell you're going," "what the f*** are you doing."

72. Owens also made derogatory comments about a tattoo Plaintiff had in front of employees, embarrassing Plaintiff. By contrast, however, Owens did not speak about the White employees in such a degrading fashion.

73. And, Owens failed to rehire Plaintiff Maxwell as he stated he would in or around early-2017.

74. Based on Defendants' willful and intentional conduct, Plaintiffs have been harmed as follows:

## COUNT I: 42 U.S.C. § 1981

For their first cause of action, Plaintiffs incorporate all prior allegations and further allege and state as follows:

75. This Count is asserted on behalf of all Plaintiffs.

76. This Count is asserted against Defendant Metro Ready-Mix and Defendant Owens.

77. The matters alleged above constitute violations of 42 U.S.C. § 1981 in the nature of race-based discrimination, harassment, the creation of a racially hostile work environment, and retaliation.

78. Plaintiffs are entitled to relief under is entitled to relief under 42 U.S.C. § 1981 for race discrimination because, as stated herein, Plaintiffs are Black; were qualified for their jobs; were actually or constructively discharged; and their positions were not eliminated.

79. Plaintiffs are further entitled to relief under 42 U.S.C. § 1981 for race discrimination because, as stated herein, Plaintiffs are Black; they suffered adverse employment actions (with respect to discipline, work schedules, work hours, work assignments and pay); and similarly situated non-Black employees were treated differently.

80. Plaintiffs are also entitled to relief under 42 U.S.C. § 1981 for racial harassment, in that, looking at the totality of the circumstances, Plaintiffs were subject to harassment which was pervasive or severe enough to alter the terms, conditions or privileges of their employment, and the harassment was racial or stemmed from racial animus.

81. Plaintiffs are also entitled to relief under 42 U.S.C. § 1981 for retaliation because Plaintiffs engaged in protected opposition to race discrimination; they suffered adverse actions subsequent to the protected activity; and a causal link exists between the

protected activity and the adverse actions.

82. As damages, Plaintiffs have suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages.

83. Because the actions of the Defendants were willful, wanton or, at the least, in reckless disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive damages.

### COUNT II:  Title VII

For their second cause of action, Plaintiffs incorporate all prior allegations and further allege and state as follows:

84. This Count is asserted on behalf of Plaintiffs Carson, Simpkins and Smith.

85. This Count is asserted against Defendant Metro Ready-Mix, only.

86. The matters alleged above constitute violations of Title VII of the Civil Rights Act of 1964 in the nature of race discrimination, harassment, the creation of a racially hostile work environment, and retaliation.

87. As damages, Plaintiffs have suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

88. Because the actions of Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive damages as provided by the Civil Rights Act of 1991.

### COUNT III: *Burk* Tort

For their third cause of action, Plaintiffs incorporate all prior allegations and further allege and states as follows:

89. This Count is asserted on behalf of Plaintiffs Carson, Simpkins and Smith.

90. This Count is asserted against Defendant Metro-Ready Mix, only.

91. The acts above-described constitute a violation of Oklahoma's public policy which prohibits wrongful termination and retaliation against a whistle-blower for performing an act consistent with a clear and compelling public policy, i.e., refusing to participate in an illegal activity; performing an important public obligation; exercising a legal right or interest; exposing some wrongdoing by the employer; and performing an act that public policy would encourage or, for refusing to do something that public policy would condemn.

92. More particularly, Plaintiffs Carson, Simpkins and Smith were wrongfully discharged from their employment in retaliation for having complained about Defendant Metro Ready-Mix's failure to provide a safe working environment, including *inter alia* requiring Plaintiffs to operate unsafe vehicles and drive in excess of hours of service limitations, i.e., an act consistent with clear and compelling public policy articulated in *inter alia* the Motor Carrier Act, Okla. Stat. tit 47 §230.21, *et seq.* ("it is necessary in the public interest … for motor carriers …to provide service in a safe and efficient manner[.]")

93. Plaintiffs have suffered injuries and are entitled to recover all damages or other relief allowed by state law, including but not limited to, lost wages (past and future), emotional distress damages, punitive damages, and attorney's fees and costs.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment in favor of the Plaintiffs and against Defendants and award compensatory damages, wage loss (including back pay and front pay), emotional distress damages, punitive damages, together with any appropriate equitable relief, pre- and post-judgment interest, costs and attorney's fees, and all other damages recoverable as to the above-listed claims.

Respectfully submitted this 5th day of April, 2018.

s/ Jana B. Leonard
**JANA B. LEONARD, OBA # 17844**
**LAUREN W. JOHNSTON, OBA #22341**
**SHANNON C. HAUPT, OBA # 18922**
**LEONARD & ASSOCIATES, P.L.L.C.**
**8265 S. Walker**
**Oklahoma City, Oklahoma 73139**
**(405) 239-3800 (telephone)**
**(405) 239-3801 (facsimile)**
**leonardjb@leonardlaw.net**
**haupts@leonardlaw.net**

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**